1    John Burton, State Bar No. 86029
     jb@johnburtonlaw.com
2    THE LAW OFFICES OF JOHN BURTON
     4 East Holly Street, Suite 201
3    Pasadena, California 91103
     Telephone: (626) 449-8300
4    Facsimile: (626) 449-4417

5    Attorneys for Plaintiff Alma Pereira, individually,
     as the personal representative of
6    Daniel Andres Maira Pereira, deceased, and
     as guardian ad litem for DPD, a minor

7

8

9               **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11   ALMA PEREIRA, individually, as the personal representative of DANIEL ANDRES MAIRA PEREIRA, deceased, and as guardian ad litem for DPD, a minor, | Case No. CV-14-6375 RGK (VBKx) |
| 12 | **PLAINTIFF'S PETITION (UNOPPOSED) FOR ORDER APPROVING COMPROMISE OF MINOR'S CLAIM; MEMORANDUM OF LAW; DECLARATIONS OF ALMA PEREIRA, VIANCA DUBON AND JOHN BURTON; EXHIBITS** |
| 13 | |
| 14          Plaintiff, | |
| 15       v. | |
| 16   COUNTY OF LOS ANGELES, et al., | Date:       August 17, 2015 |
| 17        Defendants. | Time:       9:00 a.m. |

18

19

20      TO THE HONORABLE COURT:

21        Plaintiff Alma Pereira, individually, as the personal representative of Daniel

22 Andres Maira Pereira, deceased, and as guardian ad litem for DPD, a minor, hereby

23 petitions the Court for an Order approving the compromise agreement reached by the

24 parties after private mediation. Exhibit A. Approval of the proposed settlement would

25 dispose of the entire action with prejudice.

26        Plaintiff has noticed the hearing on the petition for Monday, August 17, 2015, at

27 9:00 a.m., or as soon thereafter as the matter may be heard. Defendants are fully

28 apprised as to the contents of this petition and support the Order requested.

1    The grounds for the petition are set forth in the attached memorandum of law

2  and declarations. The parties have met and conferred several times since they reached

3  the underlying settlement agreement at mediation on April 20, 2015, with the assistance

4  of retired Los Angeles Superior Court Judge Joe W. Hilberman. Defense counsel have

5  reviewed a copy of these papers. As mentioned above, defense counsel do not object to

6  the contents of the petition or the Order being issued.

7    Plaintiff bases her petition on the attached memorandum, declarations and

8  exhibits, on all pleadings and papers filed herein, and on such further matters as the

9  Court deems necessary or appropriate.

10  Respectfully submitted,

11  Dated:  July 13, 2015                    THE LAW OFFICES OF JOHN BURTON

12

13                                          /s/ John Burton
                                   By: _____
14                                              John Burton
                                          Attorneys for Plaintiff

- 2 -

**Memorandum of Law In Support of Petition for Order Approving Settlement**

**1.      Introduction**

Plaintiff and Defendants have agreed to a $250,000 settlement of the damages claim asserted on behalf of a minor, DPD, arising from the alleged wrongful death of his father, Daniel Andres Maira Pereira, at the Los Angeles County Men's Central Jail. The formal agreement is attached hereto as Exhibit A.

C.D. Cal Rule 83-5.1 provides that a minor's claim may not be settled without leave of the Court embodied in an order, judgment or decree. DPD's Guardian ad Litem Alma Pereira, who is also a plaintiff individually, hereby petitions the Court for such leave and submits a proposed order. She and DPD's mother, Vianca Dubon, respectfully request that the Court approve the order, bringing the litigation to an end.

C.D. Cal. Rule 83-5.2 provides that "Insofar as practical, hearings on petitions to compromise the claim of a minor should conform to California Code of Civil Procedure § 372 and California Rule of Court 3.1384." Section 372(a)(1) requires court approval and the sequestration of funds recovered on behalf of a minor. Petitioner seeks to sequester the funds through the purchase of an annuity designed to provide DPM with resources to continue his education, and to spread the distribution of the settlement over several years.

Rule 3.1384 expressly incorporates Rules 7.950-7.955.

Rule 7.950 provides that the petition "must be verified by the petitioner and must contain a full disclosure of all information that has any bearing upon the reasonableness of the compromise, covenant, settlement, or disposition." The facts are set forth below, and are verified by petitioner's declaration. Rule 7.951 provides that the attorney must make certain disclosures, and Rule 7.955 provides the standard for attorneys' fees. These matters are set forth in the accompanying Declaration of John Burton. Rule 7.952 provides that a hearing should be held "unless for good cause the court dispenses with such personal appearance." Accordingly, Petitioner will appear on August 17, 2015, at 9:00 a.m., unless the Court orders otherwise.

1   The settlement agreement must be approved by the Los Angeles County Board
2   of Supervisors. The process has been moving forward for almost three months, but
3   apparently may take several more months to complete. The parties request that the
4   Court nevertheless approve the settlement at this time, enter the appropriate Order, and
5   vacate the pending dates.

6   **2.    Summary of Facts.**

7   The minor, DPM, is male and almost five years old. His mother is Vianca
8   Dubon. His father is Daniel Andres Maira Pereira, the Decedent. Petitioner is the
9   Decedent's mother, and therefore DPD's Grandmother.

10  For most his adult life, the Decedent struggled with substance abuse, including
11  heroin and alcohol, and was in and out of jail on various charges and violations. On
12  November 23, 2013, the Los Angeles Police Department arrested the Decedent for a
13  probation violation, and two days later transferred him to the custody of the Los
14  Angeles County Sheriff's Department. The Decedent was medically screened at jail. The
15  chart reflects the assessment that he was suffering alcohol and heroin withdrawals.

16  According to the jail's medical chart, a jail physician ordered a complete blood
17  count and liver function profile, but apparently no blood was drawn, and therefore the
18  tests were not completed. Plaintiff alleges that were the Decedent's blood drawn and
19  analyzed, the peritoneal infection that caused his death four days later would instead
20  have been diagnosed timely and treated successfully.

21  Over the next several days, the Decedent experienced a series of medical crises
22  and was seen by various jail health care workers, although never again by a physician.
23  On the afternoon of November 30, 2013, the Decedent died in his cell at age 23.

24  The autopsy revealed the Decedent had a perforated ulcer, which caused
25  peritonitis, the inflamation of the peritoneal cavity due to leakage from the
26  gastrointestinal tract. When treated promptly with antibiotics and surgical repair,
27  peritonitis can, in most cases, be treated successfully. When allowed to progress,
28  however, peritonitis is invariably lethal.

3.        **The Litigation**

As mentioned above, Plaintiff Alma Pereira is the Decedent's mother and DPD's grandmother. Plaintiff filed suit, alleging both § 1983 deliberate indifference and state-law medical negligence. Plaintiff appears in three capacities: (1) individually, asserting her own Fourteenth-Amendment claim for loss of familial relationship, (2) as her son's successor in interest seeking the damages that survive, and (3) as the guardian ad litem for her grandson DPD, the Decedent's minor child, for wrongful death damages.

During the school year, DPD lives with Plaintiff and her husband, Jorge Gonzalez, an engineer employed at Jet Propulsion Laboratory. DPD's mother, Vianca Dubon, has consented to Plaintiff acting as guardian ad litem. Ms. Dubon has been actively involved with Plaintiff and her husband in rearing DPD, and in overseeing DPD's interests throughout the litigation. She joins this Petition.

4.        **The Proposed Settlement and Distribution**

After resolving issues relating to the pleadings, and exchanging information informally, on April 20, 2015, the parties mediated the case. With the assistance of retired Los Angeles Superior Court Judge Joe W. Hilberman, the parties reached an agreement that the County would pay a total of $250,000 (the MICRA cap for general damages) in exchange for a dismissal of the entire action with prejudice.

At the mediation, the parties and mediator agreed, subject to this Court's approval, that $120,000 fund an annuity for DPD. Petitioner and Ms. Dubon have selected an annuity that will pay $500 per month commencing at age 18, and $1000 per month from age 21 to age 25. DPD will receive lump sum payments of $40,000 at age 25, $50,000 at age 30 and approximately $100,000 at age 35. (The exact amount of the last payment depends on interest rates a few months from now, when the annuity is funded.) The total payout to DPD will be approximately $255,505.80.

Petitioner proposes that the $130,000 cash balance be distributed $51,100 to Plaintiff for her Fourteenth-Amendment due-process claim, and for reimbursement of $12,000 in funeral and burial expenses.

Finally, the petition requests that $75,000 be paid to Plaintiff's attorneys for fees (calculated at 30 per cent of the total recovery), and $3,900 to reimburse costs advanced.

**5.     Conclusion**

For the foregoing reasons, the parties urge that the Court approve the settlement as a fair and just resolution of the case, which is in the best interests of the parties and, most importantly, DPD.

Respectfully submitted,

Dated:  July 13, 2015                    THE LAW OFFICES OF JOHN BURTON


By:    _____/s/ John Burton_____
                    John Burton
                 Attorneys for Plaintiff

**Declaration of Alma Pereira**

Petitioner Alma Pereira declares under penalty of perjury as follows:

1.      I am the grandmother of DPD, a minor, whose father, my son, is the Decedent, Daniel Andres Maira Pereira, whom we refer to as "Danny." I am the Plaintiff in this action, asserting claims (1) on my own behalf, (2) as Danny's successor in interest, and (3) as Guardian ad Litem for DPD.

2.      I raised Danny with considerable help from my second husband, Jorge Gonzalez. Jorge is employed as an engineer at Jet Propulsion Laboratory. Danny's biological father had no role in Danny's upbringing, and I know nothing of his current whereabouts, or even whether he is still living. Jorge and I have an 11-year-old son, Danny's half-brother.

3.      Danny and Vianca Dubon, Danny's steady girlfriend at the time, gave birth to my grandson, DPD, who is is now 4 years old. By agreement with Vianca, during the school year DPD resides with me, my husband and our son at 3255 Prospect Avenue, La Crescenta, California 91314. Vianca lives in Escondido. She visits with DPD regularly. DPD is staying with Vianca for the summer, but will be returning to live with us right around the date set for the hearing on this petition.

4.      I was particularly close to Danny, my oldest child, and his struggles were very much a part of my life. Jorge and I tried everything in our power to help Danny overcome his addictions. We continued to hold out hope until we heard about his death that Danny would turn his life around, especially given Danny's affection for his young son. I continue to miss Danny every day, and continue to believe that had we more time, Danny would have recovered from his addictions.

5.      Danny was arrested on a probation violation by the LAPD, and then incarcerated by the Los Angeles County Sheriff's Department in late November, 2013. Thanksgiving weekend I learned that Danny passed away. I was, of course, devastated, especially given the circumstances of his death. We retrieved Danny's remains after the autopsy, and paid $12,000 for an appropriate funeral and burial.

6.      I participated in the April 20, 2015 mediation with Retired Judge Joe W. Hilberman in Century City. He was most helpful and constructive. I also appreciated that the lead attorney for the Defendants, George E. Peterson, Esq., personally expressed condolences for the loss of my son. Vianca Dubon and I participated throughout the mediation. At the end we executed the handwritten agreement attached as Exhibit B, which includes the proposed distribution of the settlement among DPD, me and our counsel. We believe the final agreement, attached as Exhibit A, reflects our understanding, and is a fair resolution of this case.

7.      Jorge and I receive no financial assistance from any source for DPD. I anticipate that DPD will continue living with us, at least during the school year, until he reaches adulthood. The current arrangement is working well, and we love DPD very much. My proposed portion of the settlement, which I understand represents just less than $40,000 in compensation for my claim for loss of a familial relationship with Danny, along with $12,000 in burial expense reimbursement, is fair given my loss of a son, and will help defray the expenses of rearing DPD.

8.      Jorge, Vianca and I together reviewed a variety of possible annuity options for DPD. We believe distributing the settlement proceeds over a number of years makes more sense than giving DPD access to the entire principal at age 18. Also annuities provide higher interest than blocked accounts and deposits with the court clerk. The plan we selected will provide DPD with $500 per month starting at age 18, increasing to $1,000 per month at age 21, until age 25, when he will receive substantial lump-sum payments at 25, 30 and 35. The proposed annuity plan, with DPD's birth date redacted, is attached as Exhibit C. This plan will permit DPD to pursue college, with our assistance, and to postpone his receipt of larger sums until, hopefully, he has acquired the maturity to handle money wisely, perhaps to repay student loans or purchase a residence. I respectfully request that the Court approve the annuity, rather than direct that the money be held by the court clerk or in a blocked account.

9.   I signed a retainer agreement with John Burton dated April 24, 2014. The agreement provides for a maximum forty percent contingency fee, subject to court approval because of DPD's age. (There are also provisions, not applicable here, for the disposition of court-awarded attorney fees.) I understand that Mr. Burton is seeking a reduced thirty percent contingency fee from the $250,000 recovery, which I believe is reasonable under the circumstances. I ask that the Court approve the request.

10.   I have read the contents of these papers, and verify them as true of my own personal knowledge, unless the context indicates otherwise, in which case I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in _Pasadena_ California on July 13, 2015.

Alma Pereira

- 9 -

**Declaration of Vianca Dubon**

Vianca Dubon declares, under penalty of perjury, as follows:

1.     I am the mother of DPD, who is presently four years old. The Decedent, Daniel Andres Maira Pereira, is DPD's father.

2.     Prior to the Decedent's death, DPD was living with the Decedent's mother, Alma Pereira, and her husband, Jorge Gonzalez, in La Crescenta. That arrangement has continued. I am living in Escondido in San Diego County, but I visit with DPD regularly and am involved in his upbringing. DPD is staying with me over the Summer, but will be returning to La Crescenta for the school year. There are no written agreements or court orders in effect, but this arrangement works well for all of us and in my judgment is in DPD's best interest.

3.     After DPD's father died in the Los Angeles County Jail, Alma, Jorge and I met with attorney John Burton. I agreed that the case should go forward on DPD's behalf and signed the contingency-fee retainer agreement, which provides for a maximum 40 percent contingency fee, subject to court approval because of DPD's age. I understand that Mr. Burton is seeking a reduced 30 percent contingency fee, which I believe is reasonable under the circumstances. I ask that the Court approve the request.

4.     Although I am not formally a party, I have participated in all stages of this litigation. Because DPD is living with Alma, who has her own claim for damages and is located in Los Angeles County, I agreed that Alma should act as Guardian ad Litem, and so indicated on the application. I attended the mediation with Judge Hilberman, participated in all the settlement discussions, and agreed to the settlement amount. I support the distribution proposed in Exhibit B, and urge that the Court approve it.

5.     Jorge, Alma and I together reviewed a variety of possible annuity options for DPD. For obvious reasons we believe distributing the settlement proceeds over a number of years makes much more sense than giving DPD access to the entire principal at age 18. The plan we selected, Exhibit C, will provide DPD with $500 per month starting at age 18, increasing to $1,000 per month at age 21, until age 25, when

he will receive substantial lump-sum payments at 25, 30 and 35. This plan will permit DPD to pursue college, and to postpone his receipt of larger sums until, hopefully, he has acquired the maturity to handle money wisely, perhaps to repay student loans or purchase a residence. I respectfully request that the Court approve the annuity, rather than direct that the money be held by the court clerk or in a blocked account.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in <u>San Diego</u>, California on July 13, 2015.

Vianca Dubon

- 11 -

**Declaration of John Burton**

John Burton declares under penalty of perjury as follows:

1.        I am a member of the State Bar of California and am admitted to practice in all four California United States District Courts, the Fourth, Sixth, Eighth and Ninth Circuit Courts of Appeal, and the United States Supreme Court. I represent Plaintiff and Petitioner Alma Pereira in this sad litigation arising from the death of her son, Daniel Andres Maira Pereira, at age 23 in the Los Angeles County Men's Central Jail.

2.        I submit this declaration in support of the foregoing Petition for Approval of compromise of the claim of the Decedent's four-year-old son, DPD, and the request for a thirty percent attorneys' fee. I also have a signed retainer with Vianca Dubon, DPD's mother.

**Qualifications**

3.        I graduated from Hastings College of the Law and was admitted to the California State Bar in May 1979. I concentrate on litigation involving the public interest and civil rights in both state and federal trial and appellate courts. For more than thirty years I have focused on representing plaintiffs in police- and jail-related actions such as this one. Since May 1984 I have managed my own firm. In 1989, I first earned an A-V rating from Martindale-Hubbell. For the last seven years I have been listed as a Southern California "Super Lawyer" in civil rights.

4.        I personally have litigated hundreds of police-misconduct and jail cases in both state and federal court, including over 40 that have reached verdicts. I was lead counsel for the 12 lawyers who represented the victims of the Los Angeles Police Department's August 1, 1988 raid at 39th Street and Dalton Avenue, which led to $3.5 million recovered, at the time the largest police-misconduct payout in Southern California history. I served as vice-lead counsel (lead counsel was the late Hugh Manes) for the team of 16 lawyers that represented plaintiffs in *Thomas v. County of Los Angeles*, a class action lawsuit that resulted in significant institutional changes in the Los Angeles Sheriff Department Lynwood Substation and a recovery of $7.5 million. I was vice-lead

1  counsel with Barry Litt for a team of 10 attorneys representing plaintiffs in a series of
2  related class-actions to recover damages for people over detained in the Los Angeles
3  County Jail System, and for people subjected to visual body cavity searches after they
4  have been ordered released from jail by a judge, leading to a record recovery of
5  $27,000,000.

6      5.      I have reported decisions in the California Court of Appeal, the California
7  Supreme Court, the Fourth, Eighth and Ninth Circuits, and the United States Supreme
8  Court. Several are particularly helpful for plaintiffs pursuing civil-rights claims in the
9  Ninth Circuit. *E.g.*, *Montiel v. City of Los Angeles*, 2 F.3d 335 (9th Cir. 1993) (Christopher
10 Commission report admissible to prove *Monell* violation); *Greenstreet v. Cnty of San*
11 *Bernardino*, 41 F.3d 1306 (9th Cir. 1994) (no qualified immunity for submitting search
12 warrant that does not establish probable cause); *Streit v. Cnty of Los Angeles*, 236 F.3d
13 552 (9th Cir. 2001) (establishing County as local actor for Eleventh-Amendment
14 immunity); *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) (due process violated by
15 withholding exonerating evidence before trial), *cert. denied*, 2015 U.S. LEXIS 3307
16 (2015); and *Castro v. Cnty. of Los Angeles*, 785 F.3d 336 (9th Cir. 2015) (no qualified
17 immunity for jailors who ignored threat posed by drunken, combative inmate).

**The Facts of This Case and the Work Performed**

19     6.      I was contacted by Alma Pereira and her husband, Jorge Gonzalez, shortly
20 after they learned of this death. I personally viewed and photographed the remains at
21 the mortuary. Since the death occurred in custody, there was little information initially. I
22 interviewed available witnesses, including a friend who visited the Decedent in jail.
23 When the autopsy report became available, I reviewed it and consulted with medical
24 experts. I confirmed the cause of death, peritonitis, at that time. My research and
25 consultation indicated that such deaths generally do not happen absent negligence or
26 deliberate indifference.

27     7.      I prepared the administrative claim, which was denied. I then prepared
28 and filed this litigation. I opposed Defendants' motion to dismiss.

8.      Defense counsel were cooperative in turning over the medical chart, which I reviewed personally and then had reviewed by a consulting physician. I used the chart to identify the individual defendants. I amended the complaint and supervised the preparation of summons and service of process. The Defendants answered.

9.      According to the medical chart and the other records available for my review, the Decedent was arrested on November 23, 2013, by the Los Angeles Police Department for a parole or probation violation. The Decedent was processed through the Los Angeles County Jail Inmate Reception Center (IRC) on November 25, where he was medically screened and noted to be suffering heroin and alcohol withdrawals.

10.      Defendant Patrick C. Paik, M.D., saw the Decedent in the IRC mid-day on November 26, 2013. That is the only record of a physician's examination.

11.      The chart for the next morning, November 27, shows Dr. Paik's orders for a complete blood count (CBC) and liver function profile. Apparently no blood was drawn, and therefore no tests were performed. My understanding is that had blood been drawn and analyzed, the peritoneal infection that caused Danny's death four days later would have been diagnosed timely and treated successfully. These facts were central to Plaintiff's liability theory.

12.      The Decedent was housed in a module in Men's Central Jail instead of the infirmary. Rather than improve, as one would expect for a 23-year-old after several days of withdrawals, the Decedent reported he felt terrible. The Decedent cut short a visit on the afternoon of November 28 (Thanksgiving Day), and collapsed in his cell. Defendants Akelat D. Gezahegne, RN, and Emie Rita L. Banaga, RN, wheeled the Decedent to the clinic on a gurney, where they apparently consulted with Defendant Lawrence L. Laughlin, M.D., over the telephone. Dr. Laughlin neither saw his patient nor ordered any further testing or treatment. Dr. Laughlin did not follow up on the CBC that had been ordered but not performed. Instead, Dr. Laughlin allowed the Decedent to be returned to his cell, rather than sent to County-USC Medical Center, or, at least the jail infirmary, for further evaluation and treatment.

- 14 -

13.     The next morning, November 29, the Decedent collapsed again in his module. According to the chart, after being revived, he told Defendant Ji E. Kim, RN, that he had been "throwing up with blood, it started three days ago." The chart records significant sinus tachycardia. The Decedent was again taken to the clinic, where, according to his chart, he told Defendant Nachet M. Harris, RN, that he had been vomiting blood. Nurse Harris' examination confirmed his elevated heart rate. She also charted abdominal abnormalities. After 40 minutes, however, the Decedent was sent back to the jail module with no further medical evaluation or treatment. There is no record that a physician was consulted.

14.     On Saturday, November 30, in the afternoon, the Decedent collapsed in his cell a third time. Paramedics pronounced him dead in the jail module, and transported his remains directly to the morgue.

15.     The autopsy revealed three perforated stomach ulcers between 2 to 8 millimeters in diameter, which resulted in leakage and therefore inflammation of the peritoneal cavity. Such an acute case of peritonitis invariably presents escalating symptoms, including elevated white blood cell counts, tachycardia, abdominal rigidity, gastrointestinal bleeding, and nausea. I could see that Defendants charted many of these symptoms, but failed to act on them. Peritonitis can be positively diagnosed with imaging, and when treated promptly with antibiotics and surgery, has a mortality rate of less than 10 percent. When allowed to progress untreated, however, peritonitis is invariably lethal, as in this case.

16.     The Amended Complaint pled two essential legal theories. The first is that the Defendants were deliberately indifferent to the Decedent's serious medical needs, thus depriving him, and his survivors, of rights guaranteed by the Fourteenth Amendment, giving rise to claims for damages, and attorney's fees, under 42 U.S.C. § 1983. The second is medical malpractice, which from a plaintiff's perspective is easier to prove, but subject to MICRA limitations and the defense of comparative negligence.

17.     At an early stage, defense counsel George Peterson and I, along with the claims representative for the County, Ed Benveniste, discussed the advantage of exploring an early resolution, rather than spending significant sums on discovery and experts before discussing settlement. We exchanged additional information and contentions, and then scheduled an April 20, 2015 mediation with retired Superior Court Judge Joe W. Hilberman in Century City.

18.     I prepared the clients for mediation and drafted a detailed statement for Judge Hilberman. Obviously both sides faced substantial issues, both pro and con, on liability and damages. Defendants knew that were Plaintiff to prove deliberate indifference, there would be no MICRA cap nor defense of comparative negligence. Both Plaintiff and DPD would be attractive to a jury. Besides allowing for Plaintiff's recovery on her Fourteenth-Amendment claim for loss of familial relations, establishing deliberate indifference would permit Plaintiff to pursue fees pursuant to 42 U.S.C. § 1988. On the other hand, I knew the Decedent's substance abuse history was substantial and most likely caused the perforated ulcers. While Plaintiff believes her son would have become clean and sober, had he survived the peritonitis, a jury may well have taken a more jaded view of his prognosis. A major concern of mine was that a jury might compromise on a verdict by finding simple negligence, rather than deliberate indifference, unaware of the significant legal consequences of that decision.

19.     Against this background, with Judge Hilberman's able assistance, at mediation we reached agreement for $250,000, which equals the cap recoverable were Plaintiff to succeed only on the negligence claim. Exhibit A is the proposed settlement agreement drafted by counsel. We also reached agreement on our recommendation to the Court regarding how the settlement should be distributed. See Exhibit B.

20.     Subsequently, I worked with the structured settlement consultant retained by Defendants and with Plaintiff and her husband, and Ms. Dubon. After significant discussions, and various revisions, they agreed on the settlement structure set forth in Exhibit C. I think this structure is in the best interest of DPD.

**The Attorneys' Fee Claim**

21.    I contracted with Alma Pereira and Vianca Dubon for a contingency fee of 40 percent on the total recovery, noting that the Court would have to approve the fee. Because of the relatively early stage at which this case resolved, I indicated at the mediation that I would seek a 30 percent fee. Plaintiff, Defense Counsel and Judge Hilberman agreed with this request. Exhibit B.

22.    Cal. R. Ct. 7.951 requires that the petition set forth the following disclosures where a petition has been represented by counsel:

**"(1)    The name, state bar number, law firm, if any, and business address of the attorney":**  John Burton, State Bar No. 86029, THE LAW OFFICES OF JOHN BURTON, 4 East Holly Street, Suite 201, Pasadena, California  91103.

**"(2)    Whether the attorney became involved with the petition, directly or indirectly, at the instance of any party against whom the claim is asserted or of any party's insurance carrier":** No.

**"(3)    Whether the attorney represents or is employed by any other party or any insurance carrier involved in the matter":** No.

**"(4)    Whether the attorney has received any attorney's fees or other compensation for services provided in connection with the claim giving rise to the petition or with the preparation of the petition, and, if so, the amounts and the identity of the person who paid the fees or other compensation":** No fees outside the contingency fee approved by this Court.

**"(5)    If the attorney has not received any attorney's fees or other compensation for services provided in connection with the claim giving rise to the petition or with the preparation of the petition, whether the attorney expects to receive any fees or other compensation for these services, and, if so, the amounts and the identity of the person who is expected to pay the fees or other compensation":** I request that the Court set the contingency fee at 30 percent, which equals $75,000, payable out of the settlement funded by the County of Los Angeles.

- 17 -

**"(6)   The terms of any agreement between the petitioner and the attorney":** My written retainer agreement, signed by Plaintiff and Ms. Dubon, provides, in relevant part, as follows:

> We are representing you for a contingency fee.  This means that you will not owe us any fees for our services unless we recover money on your behalf. Because [DPM] is a minor, the fee for his recovery is subject to court approval at the conclusion of the case. The amount of Alma's contingency fee, and the maximum amount we may seek on behalf of [DPM], will be the greater of:
>
> (a)      Forty percent of all sums recovered; or
>
> (b)      An amount equal to The Law Offices of John Burton's regular hourly rates for matters of this nature times the number of hours spent by the attorneys and legal assistants plus fifteen percent of the balance; or
>
> (c)      An amount equal to all court-awarded attorney's fees plus twenty percent of all other sums recovered.

The fee agreement required me to advance out-of-pocket expenses, and entitled me to reimbursement.

23.      Cal. R. Ct. 7.955(a)(1) provides that "the court must use a reasonable fee standard when approving and allowing the amount of attorney's fees payable from money or property paid or to be paid for the benefit of a minor or a person with a disability." Subsection (a)(2) states that "the court must give consideration to the terms of any representation agreement made between the attorney and the representative of the minor or person with a disability and must evaluate the agreement based on the facts and circumstances existing at the time the agreement was made." At the time I entered into the contingency fee agreement, I had the autopsy report, but not the medical chart. I knew that going forward with this representation would involve (1) difficult legal and factual issues, (2) significant out-of-pocket expenses, (3) an unsympathetic decedent, (4) great uncertainty and risk as to the result, and (5) delay in payment, if there were any recovery.

24.      Cal. R. Ct. 7.955(b) states that "in determining a reasonable attorney's fee, the court may consider the following nonexclusive factors":

**"(1)   The fact that a minor or person with a disability is involved and the circumstances of that minor or person with a disability."** Plaintiff is age 4.

**"(2)   The amount of the fee in proportion to the value of the services performed."** The 30 percent fee is on the low end of contingency fees in civil-rights cases. The amount of the fee is proportionate to the value of my services.

**"(3)   The novelty and difficulty of the questions involved and the skill required to perform the legal services properly."** While not particularly novel, the case was difficult, and required significant background in § 1983 litigation as well as a basic understanding of the medical issues involved and how jails function.

**"(4)   The amount involved and the results obtained."** The recovery of the MICRA cap under these circumstances is an excellent result.

**"(5)   The time limitations or constraints imposed by the representative of the minor or person with a disability or by the circumstances."** This factor is not relevant.

**"(6)   The nature and length of the professional relationship between the attorney and the representative of the minor or person with a disability."** This factor is not relevant.

**"(7)   The experience, reputation, and ability of the attorney or attorneys performing the legal services."** I am among the most experienced plaintiff's police misconduct attorneys currently active in Southern California. I have a good reputation nationally.

**"(8)   The time and labor required."** The case took significant labor while it was pending. In part because of my skill and reputation, the case settled at a relatively early stage, thus warranting a reduction of the contingency fee to 30 percent.

**"(9)   The informed consent of the representative of the minor or person with a disability to the fee."** Plaintiff expressly consented to a 40 percent contingency fee. The 30 percent fee recommendation was discussed at the mediation, approved by retired Judge Hilberman, and incorporated into the mediation agreement, Exhibit B.

**"(10)  The relative sophistication of the attorney and the representative of the minor or person with a disability."** I consulted throughout with both Plaintiff and her husband, an engineer at Jet Propulsion Laboratory.

**"(11)  The likelihood, if apparent to the representative of the minor or person with a disability when the representation agreement was made, that the attorney's acceptance of the particular employment would preclude other employment."** I manage a small office, and there are a finite number of cases I can accept. Every case on my docket precludes other employment.

**"(12)  Whether the fee is fixed, hourly, or contingent."** The fee is contingent.

**"(13)  If the fee is contingent:**

**"(A)   The risk of loss borne by the attorney":** There was no guarantee of any recovery. I could have lost all costs advanced along with my time.

**"(B)   The amount of costs advanced by the attorney":** To date I have advanced $3,900 in costs. A schedule is attached as Exhibit D. If the case would have proceeded further, I may have advanced as much as $50,000 in costs. Litigation expenses on both sides were a significant factor in reaching the early settlement agreement.

(C)   **The delay in payment of fees and reimbursement of costs paid by the attorney:** Besides the delays inherent in any civil-rights action, litigation against the County of Los Angeles necessarily involves a delay of 8 to 12 months from the date a settlement agreement is reached until payment.

25.   As mentioned above, Exhibit D sets forth the costs I have advanced to date, $3,900. I respectfully request that amount be paid to me in addition to the 30 percent contingency fee ($75,000).

1       I declare under penalty of perjury that the foregoing is true and correct. Executed

2  July 13, 2015, at Pasadena, California.

3

4                                 /s/ John Burton

5                                  John Burton

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

<u>SETTLEMENT AGREEMENT AND RELEASE</u>

   This Settlement Agreement and Release (the "Settlement Agreement") is made and entered into this ___ day of _____, 2015, by and between:

| | |
|---|---|
| "Plaintiff/Releasor" | Alma Pereira on her own behalf individually, as personal representative of Decedent Daniel Andres Maira Pereira's estate, and as Guardian ad Litem for DPD, a minor. |
| "Defendant/Releasee" | County of Los Angeles and any and all of its employees, agents, and representatives including individually named defendants Patrick C. Paik, M.D., Lawrence L. Laughlin, M.D., Nachet M. Harris, RNP, Emie Rita L. Banaga, RN, Akelat D. Gezahegne, RN, and Ji E. Kim, RN. |

Recitals

  A. Plaintiff/Releasor filed a Complaint against County of Los Angeles and several of its employees ("Defendant/Releasee") in the United States District Court, Central District of California, Court Action CV-14-6375 RGK (VBKx), ("the Complaint"), which Complaint arose out of certain alleged negligent acts or omissions by Defendant/Releasee.   In particular, the Complaint alleges that Defendant was negligent in the treatment and care of Plaintiff's/Releasor's son, Daniel Andres Maira Pereira ("Decedent"), and violated his Civil Rights, resulting in his death.

  B. The Parties (collectively Plaintiff/Releasor and Defendant/Releasee) desire to enter into this Settlement Agreement and Release in order to provide for certain payments in full settlement and discharge of all claims which have, or might be made, by reason of the incident described in Recital A above, and any other potential claims known or unknown that Plaintiff/Releasor may have against Defendant/Releasee, upon the terms and conditions set forth below.

Agreement

The parties agree as follows:

   1.0  **Terms**

*Exhibit C*
*to the Petition*

In consideration of the covenants undertaken and releases given herein by Plaintiff/Releasor, Defendant/Releasee shall provide to Plaintiff/Releasor, the sums set forth within the <u>Exhibit A</u> attached and incorporated herein by reference. The following consideration will be in full and final settlement release of any and all matters of any kind or nature which were alleged by, or could have been alleged by, Plaintiff/Releasor against Defendant/Releasee:

  (a) The sums will be paid following approval by the County of Los Angeles Board of Supervisors. The payment will be made simultaneously with the filing of a request for dismissal with prejudice as relating to the claims as described in Recital A, above.  The amount paid is inclusive of all attorneys' fees and costs.

All sums and periodic payments set forth in the section entitled <u>Terms</u> constitute damages on account of personal injuries or sickness, arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

Plaintiff/Releasor agrees, however, that she has not received or relied upon any advice or representation from Defendant/Releasee, or its attorneys, including advice or representation as to the tax effect of this Settlement Agreement and Release.  In accordance therewith, Plaintiff/Releasor agrees to hold harmless Defendant/Releasee, and its attorneys, from any losses Plaintiff/Releasor incurred, including any loss by reason of a determination by the Internal Revenue Service or other tax authority that said settlement monies do not constitute, in whole or part, damages on account of personal injury or sickness.

(b)     Plaintiff/Releasor will be responsible for any Medicare lien, any Medi-Cal lien, and any other medical liens relating to the care provided to Decedent as related to this action and must be satisfied out of these settlement proceeds.

(c)     Defendant/Releasee will be dismissed with prejudice.

(d)     Plaintiff/Releasor agrees to dismiss and waive any claim against Defendant/Releasee related to any possible known or unknown claim related to the allegations of this Complaint. This is set forth more fully below.

2.0     **Release and Discharge**

2.1     In consideration of the payments set forth in Section 1, Plaintiff/Releasor hereby completely releases and forever discharge Defendant/Releasee and any and all of its employees, agents, and representatives from any and all past, present or future claims, demands, obligations, actions, causes of action, wrongful death claims, rights, damages, costs, losses of services, expenses and compensation of any nature whatsoever, whether based on a tort, contract or other theory of recovery, including violation of Civil Rights, which Plaintiff/Releasor now has, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which are the subject of the Complaint (and all related pleadings) including, without limitation, any and all known or unknown claims for bodily and personal injuries to Decedent as to any claim they may have or had against Defendant/Releasee, or any future wrongful death claim of Decedent's representatives or heirs, which have resulted or may result from the alleged acts or omissions of Defendant/Releasee.

2.2     This release and discharge shall also apply to Defendant's/Releasee's past, present and future attorneys, agents, servants, representatives, employees, subsidiaries, affiliates, partners, predecessors and successors in interest, and assigns and all other persons, firms or corporations with whom any of the former have been, are now, or may hereafter be affiliated.

2.3     This release, on the part of Plaintiff/Releasor, shall be a fully binding and complete settlement among the Parties and their assigns and successors.

2.4     Plaintiff/Releasor acknowledges and agrees that the release and discharge set forth above is a general release.  Plaintiff/Releasor expressly waives and assumes the risk of any and all

claims for damages which exist as of this date, but of which Plaintiff/Releasor does not know or suspects to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Plaintiff's/Releasor's decision to enter into this Settlement Agreement and Release. Plaintiff/Releasor further agrees that Plaintiff/Releasor has accepted payment of the sums specified herein as a complete compromise of matters involving disputed issues of law and fact.  Plaintiff/Releasor assumes the risk that the facts or law may be other than Plaintiff/Releasor believes.  It is understood and agreed to by the Parties that this settlement is a compromise of a disputed claim, and the payments are not to be construed as an admission of liability on the part of the Defendant/Releasee, by whom liability is expressly denied.

2.5    Plaintiff/Releasor hereby waives any and all rights based upon the provisions of *California Civil Code* Section 1542 that reads as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which, if known to him or her, must have materially affected his or her settlement with the debtor."

### 3.0    Plaintiff's/Releasor's Right to Payments

Defendant/Releasee or its assignees shall not segregate or set aside any of its assets to fund the payments to Plaintiff/Releaser required herein.  Payments hereunder cannot be accelerated, deferred, increased or decreased by Plaintiff/Releasor or its assignees and no part of the payments called for herein or any assets of Defendant/Releasee or its assignees is to be subject to execution of any legal process for any obligation in any manner.  Furthermore, Plaintiff/Releasor shall not have the power to sell or mortgage or encumber the same, or any part thereof, anticipate the same, or any part thereof, by assignment or otherwise.

### 4.0    Attorneys' Fees

Each party hereto shall bear all attorney's fees and costs arising from the actions of its own counsel in connection with this Settlement Agreement and Release, the matters and documents referred to herein, and all related matters.

### 5.0    Delivery of Dismissal with Prejudice

Concurrently with the execution of this Settlement Agreement and Release, counsel for the Plaintiff/Releasor, shall deliver to counsel for Defendant/Releasee an executed Dismissal with Prejudice of the Complaint.  Plaintiff/Releasor hereby authorizes counsel for Defendant/Releasee to file said Dismissal with the Court and enter it as a matter of record.

### 6.0    Representation of Comprehension of Document

In entering into this Settlement Agreement and Release, Plaintiff/Releasor represents that Plaintiff/Releasor has relied upon the advice of her attorneys, who are the attorneys of her own choice, concerning the legal and income tax consequences of this Settlement Agreement and Release; that the

terms of this Settlement Agreement and Release have been completely read and explained to Plaintiff/Releasor by her attorneys; and that the terms of this Settlement Agreement are fully understood and voluntarily accepted by Plaintiff/Releasor.

### 7.0    Warranty of Capacity to Execute Agreement

Plaintiff/Releasor represents and warrants that no other person or entity has, or has had, any interest in the claims, demands, obligations, or causes of action referred to in this Settlement Agreement and Release, except as otherwise set forth herein; that Plaintiff/Releasor has the sole right and exclusive authority to execute this Settlement Agreement and Release and receive the sums specified in it; and that Plaintiff/Releasor has not sold, assigned, transferred, conveyed or otherwise disposed of any of the claims, demands, obligations or causes of action referred to in this Settlement Agreement and Release.

### 8.0    Governing Law

This Settlement Agreement and Release shall be construed and interpreted in accordance with the laws of the State of California.

For the protection of the undersigned Plaintiff/Releasor, California law requires the following to appear on this form:

**"IT IS UNLAWFUL TO (A) PRESENT OR CAUSE TO BE PRESENTED ANY FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS UNDER A CONTRACT OF INSURANCE AND (B) PREPARE, MAKE OR SUBSCRIBE ANY WRITING WITH INTENT TO PRESENT OR USE THE SAME, AND TO ALLOW IT TO BE PRESENTED OR USED IN SUPPORT OF ANY SUCH CLAIM.  ANY PERSON WHO VIOLATES ANY PROVISION OF THIS SECTION IS PUNISHABLE BY IMPRISONMENT IN THE STATE PRISON OR BY FINE NOT EXCEEDING FIFTY THOUSAND DOLLARS ($50,000) OR BOTH."**

### 9.0    Additional Documents

The Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement and Release.

### 10.0    Entire Agreement and Successors in Interest

This Settlement Agreement and Release contains the entire agreement between Plaintiff/Releasor and Defendant/Releasee with regard to the matters set forth in it and shall be binding upon and inure to the benefits of the executors, administrators, personal representatives, heirs, successors and assigns of each.

### 11.0    Liens and Other Claims

Except as set forth in Section 1.0, Plaintiff/Releasor hereby agrees and acknowledges that

she is responsible for any and all liens which exist, may exist, or in the future may exist, on any of the proceeds of the settlement.  Plaintiff/Releasor warrants that she has advised Defendant/Releasee and its attorneys or agents of any liens of which Plaintiff/Releasor is aware, and that in the event any claim is made against Defendant/Releasee, or any subsumed health care entity or provider of Defendant/Releasee by any third party on account of a lien which exists, may exist, or in the future may exist, Plaintiff/Releasor agrees to hold harmless, defend and indemnify, if requested, Defendant/Releasee, including the payment of reasonable attorney's fees, for any and all such claims which Defendant/Releasee may be forced to defend.  This paragraph applies to, but is not limited to, liens asserted by health care providers, medical insurance carries, or governmental entities which might have any interest in or claim against the proceeds of this settlement.

12.0    Medicare

It is not the purpose of this Settlement Agreement and Release to shift responsibility of medical care in this matter to the Medicare program.  Instead, this Settlement and Release is intended to resolve a dispute between the Plaintiff/Releasor and Defendant/Releasee.

a)  **Conditional Payments.**  Plaintiff/Releasor has been advised and fully understands that conditional payment information (any benefits paid by Medicare up to date of settlement), if any, are the responsibility of the Plaintiff/Releasor and must be satisfied out of these settlement proceeds.

b)  **Future Medicare Set Aside.**  Plaintiff/Releasor agrees to indemnify, defend and hold Defendant/Releasee harmless from any action by Medicare seeking payment for future medical expenses for Decedent.

c)  While it is impossible to accurately predict the need for future treatment, this settlement is based upon a good faith determination of the Parties in order to resolve a questionable claim. The Parties have attempted to resolve this matter in compliance with both state and federal law and it is believed that the settlement terms adequately consider Medicare's interest and do not reflect any attempt to shift responsibility of treatment to Medicare pursuant to 42 U.S.C. Sec. 1395y(b).  The parties acknowledge and understand that any present or future action or decision by CMS or Medicare on this settlement to Medicare or Medicare payments will not render this release void or ineffective, on in any way affect the finality of this liability settlement.

d)  **Hold Harmless.**  Plaintiff/Releasor agrees to indemnify, defend and hold Defendant/Releasee harmless from any action by Medicare seeking payment of past, current, or future medical expenses for Decedent.   Plaintiff/Releasor shall further hold Defendant/Releasee harmless from any and all adverse consequences in the event this settlement results in the loss of right to Social Security and/or Medicare benefits in the absence of this Settlement Agreement and Release.

g:\pa\dpm\mediation and settlement\settlement agreement and release.updated.doc

Plaintiff/Releaser:     Alma Pereira

By: _____
            Alma Pereira

Date: _____

## 13.0   Effectiveness

This Settlement Agreement and Release shall become effective immediately following execution by each of the parties.

Plaintiff/Releaser:     Alma Pereira on her own behalf individually, as personal representative of Decedent Daniel Andres Maira Pereira's estate, and as Guardian ad Litem for DPD, a minor.

By: _____
            Alma Pereira

Date: _____

Approved as to form and content of all and agreement to defend and indemnify as noted in Section 1.0 (c):

Plaintiff's/Releaser's Attorney:

By: _____
            John Burton, Esq.

Date: _____

Defendant:    County of Los Angeles (including individually named defendants Patrick C. Paik, M.D., Lawrence L. Laughlin, M.D., Nachet M. Harris, RNP, Emie Rita L. Banaga, RN, Akelat D. Gezahegne, RN, and JI E. Kim, RN)

By: _____
            Jerry Frick
            Director, Professional Liability Claims
            Sedgwick CMS

Date: _____

**EXHIBIT B**

## STIPULATION FOR SETTLEMENT

ALMA PEREIRA, et al
_____
Plaintiff(s)

CV-14-6375 RGK (VBKx)
_____
Case No.

vs.

County of Los Angeles, et al
_____
Defendant(s)

This case having come on this date for a voluntary mediation, it is hereby stipulated that this matter is deemed settled pursuant to the following terms and conditions:

1.  The parties stipulate that the settlement *does not* constitute an admission of liability.

2.  The defendant(s) PAK, LAUGHLIN, HARRIS, BANADA, KIM, GEZAEONE , shall pay to the plaintiff(s), Alma Pereira, individ and as GAL for DPD the sum of $ 250,000 as payment in full for his/her/its/their claims arising from the events described in this complaint.

3.  Plaintiff(s) agree(s) to accept said sum with the knowledge that they will be barred from proceedings against all defendant(s) in the future concerning this matter.

4.  Further conditions of the settlement are as follows:

    a.  The plaintiff(s) shall execute a dismissal with prejudice to be filed at such time as all settlement documents are signed and they hold the funds described above.

    b.  Plaintiff(s) will execute full and complete releases prepared by the defendant(s)' counsel which release shall include an express waiver of Civil Code 1542 thereby releasing all defendant(s) from known and unknown claims. Plaintiff(s') counsel shall not release the settlement funds until plaintiff(s) has/have executed said release(s).

    c.  Each party shall bear his/her/its/their own costs and attorney's fees.

(Other conditions, such as provisions for medical comp liens, stipulation for entry judgment, extension of the five year statute, etc., are as follows)

    d.  This settlement is subject to the approval of the

    e.  Board of Supervisors; Claims Board; County Counsel;

    f.  The settlement funds shall be paid as follows:

*(September 2009)*

The settlement is subject to approval of a minor's compromise by the Court;

Stipulation for Settlement
Page Two

g.  $ 130,000 paid "cash" up front;

*Anticipated (30%)*
*$75,000 Atty Fees*
*$5,000 costs*

h.  $ 120,000 to be used to fund an annuity,

*$50,000 claim of Alma Pereira individual*

i.  ⟹ For Daniel Aiden Pereira - Dubon DOB 8-27-10

5.  The court reserves jurisdiction to enforce the terms and conditions of the settlement pursuant to Code of Civil Procedure 664.6 upon noticed motion of any party.

6.  This mediation settlement agreement is intended to be binding and enforceable and is effective this 20th day of April, 2015, and reflects the final agreement between the parties to this dispute, and each of them, pursuant to Evidence Code Section 1123. This stipulation for settlement is admissible and subject to disclosure, despite the otherwise enforceable requirements of confidentiality, solely for the purpose of establishing in court that an agreement has been reached by the parties for purposes of enforcing and interpreting that agreement.

Dated: April 20, 2015

Attorney for: PLAINTIFFS
JOHN BURTON

Plaintiff (1) ALMA PEREIRA, indiv and as GAL.

Attorney for: _____

Plaintiff (2) _____

Attorney for: _____

Plaintiff (3) _____

Attorney for: DEFTS.
GEORGE PETERSON

Defendant (1) _____

Attorney for: _____

Defendant (2) _____

Attorney for: _____

Defendant (3) _____

*(September 2009)*

**EXHIBIT C**



**Dorothy Scanlan Stevens, CSSC**
Certified Structured Settlement Consultant
License #0795283

SAN DIEGO OFFICE
P.O. Box 4280
Oceanside, CA 92052

(888) 673-8853  Toll-Free
(760) 944-0022  Local
(619) 994-8853  Mobile
(760) 944-2950  Facsimile
Dorothy@SummitSanDiego.com

SUMMIT SETTLEMENT SERVICES, INC.

<u>EXHIBIT A</u>

A. <u>Payments</u>

     In consideration for the Settlement Agreement and Release to which this document is attached and incorporated, the County of Los Angeles (hereinafter referred to as County) hereby agrees to pay the following sums in the designated manner:

     (1)  Payments due at the time of Settlement as follows:

          $130,000 cash paid for attorney's fees and costs, and to Plaintiff Alma Pereira on her own behalf individually, and as personal representative of Decedent Daniel Andres Maira Pereira's estate. Payment will be made in accordance with the Court Order Approving Minor's Compromise.

     (2)  Periodic payments, made according to the following schedule, and in accordance with the Court Order Approving Minor's Compromise:



          Payee: ▓▓▓▓▓▓▓▓▓▓▓

          $500.00 payable monthly, beginning ▓▓▓▓▓▓ for 3 years certain only. Last guaranteed payment is due ▓▓▓▓▓▓ .

          $1,000.00 payable monthly, beginning ▓▓▓▓▓▓ for 4 years certain only. Last guaranteed payment is due ▓▓▓▓▓▓ .

          $40,000.00 on ▓▓▓▓▓ ;
          $50,000.00 on ▓▓▓▓▓ ; and,
          $99,505.80 on ▓▓▓▓▓ .

     All sums and periodic payments set forth in the section entitled <u>Payments</u> constitute damages on account of personal injuries or sickness, arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

     Releasor agrees, however, that they have not received or relied upon any advice or representation from the County, or their attorneys, including advice or representation as to the tax effect of this Agreement.  In accordance therewith, Releasor agrees to hold harmless the County from any losses to Releasor  incurred including any loss by reason of a determination by the Internal Revenue Service or other tax authority that said settlement monies do not constitute, in whole or part, damages on account of personal injury or sickness.

B. <u>Qualified Assignment</u>

     The Parties hereto acknowledge and agree that the County may make a "qualified assignment" within the meaning of Section 130(c), of the Internal Revenue Code of 1986, as amended, to New York Life Insurance & Annuity Corporation [hereinafter referred to as Assignee(s)] of the County's liability to make the periodic payments described in paragraph A(2) herein.

     Such assignment, if made, shall be accepted by the Releasor without right of rejection and shall completely release and discharge the County from such obligations hereunder as are assigned to Assignee(s).

The obligation assumed by Assignee(s) with respect to any required payment shall be discharged upon the mailing of a check or electronic funds transfer on or before the due date of a valid payment in the amount specified to the address of record. In the event Payee notifies the Assignee(s) that a check has not been received, or that an electronic transfer has not been deposited, Assignee(s) will initiate a stop payment action, and, upon confirmation that such check has not been negotiated or electronic funds transfer deposited, Assignee(s) shall issue a replacement check or electronic funds transfer.

The Releasor  hereto expressly understand and agree that upon the qualified assignment being made by the County to Assignee(s) as authorized by this agreement, all of the duties and responsibilities to make the periodic payments otherwise imposed upon the County by this agreement shall instead be binding upon Assignee(s), and the County shall be released from all obligations to make said periodic payments, and Assignee(s) shall at all times remain directly and solely responsible for and shall receive credit for all such payments made to Releasor(s).  It is further understood and agreed that, upon such a qualified assignment, Assignee(s) assumes all of the duties and responsibilities of the County to make the periodic payments.

The Releasor agree that:

(1)   Periodic payments under this Release from Assignee(s) cannot be accelerated, deferred, increased or decreased by the Releasor.

(2)        The Assignee's obligation for payment of the periodic payments shall be no greater than that of the County's liability (whether by suit or agreement) for payment and from whom the obligation was assigned.

## C.  Releasor's Right to Payments

The County and/or Assignee(s) shall not segregate or set aside any of its assets to fund the payments to Releasor required herein.  Payments hereunder cannot be accelerated, deferred, increased or decreased by the Releasor and/or Assignee(s) and no part of the payment(s) called for herein or any assets of the County and/or Assignee(s) is to be subject to execution of any legal process for any obligation in any manner.  Furthermore, the Releasor shall not have the power to sell or mortgage or encumber the same, or any part thereof, anticipate the same, or any part thereof, by assignment or otherwise.

## D.  Right to Purchase an Annuity

Releasor agree that the County and/or Assignee(s) shall have the right to fund its liability to make periodic payments by purchasing a "qualified funding asset", within the meaning of Section 130(c) of the Code, in the form of an annuity policy brokered through Summit Settlement Services from New York Life Insurance Company [hereinafter referred to as Annuity Issuer(s)].

The Assignee(s) shall be the owner of the annuity policy or policies, and shall have all rights of ownership. The Assignee(s) may have Annuity Issuer(s) mail payments directly to the Releasor.  The Releasor shall be responsible for maintaining the currency of the proper mailing address and mortality information to Assignee(s).

## E.  Releasor's Beneficiary

Any payments to be made after the death of the Releasor pursuant to the terms of this Settlement Agreement and Release shall be made to such person or entity as shall be designated in writing at the time of settlement by said Releasor to the Assignee(s).  If no person or said entity is so designated by the Releasor , or if the person designated is not living at the time of the Releasor's death, such payments shall be made to the estate of the Releasor.  No such designation, nor any revocation thereof, shall be effective unless it is in writing

and delivered to the Assignee(s).  The designation must be in a form acceptable to the Assignee(s) before such payments are made.

F.    **Effectiveness**

This "Exhibit A" to the Settlement Agreement and Release shall become effective immediately following execution by each of the parties.

Plaintiff/Releaser:    Alma Pereira on her own behalf individually, as personal representative of Decedent Daniel Andres Maira Pereira's estate, and as Guardian ad Litem for DPD, a minor.

By: _____
                  Alma Pereira

Date: _____

Plaintiff's/Releasor's Attorney:

By: _____
                  John Burton, Esq.

Date: _____

Defendant:    County of Los Angeles (including individually named defendants Patrick C. Paik, M.D., Lawrence L. Laughlin, M.D., Nachet M. Harris, RNP, Emie Rita L. Banaga, RN, Akelat D. Gezahegne, RN, and JI E. Kim, RN)

By: _____
                  Jerry Frick
                  Director, Professional Liability Claims
                  Sedgwick CMS

Date: _____

**EXHIBIT D**

# *Matter Billing Detail*

## LAW OFFICES OF JOHN BURTON

Dates Included: 01/01/1900 to 07/06/2015

Client # :   AP1                           Alma Pereira

Matter # :   DPM                          Pereria v County of Los Angeles

| Date | Exp. Code | Description | Debit |
|------|-----------|-------------|-------|
| | | **Balance Forward:** | $0.00 |
| 3/6/2014 | COU | Courier Charges: Feb 2015 | $84.22 |
| 8/13/2014 | FF | Filing Fee: Complaint | $400.00 |
| 9/15/2014 | SOP | Service of Process: LACO Sheriffs' Dept, Board of Supervisors | $130.00 |
| 10/9/2014 | COU | Courier Charges: Sept. 2014 | $84.92 |
| 10/17/2014 | SRV | Service of Process Amended Complaint; County of Los Angeles and Los Angles County Sheriff's Dept. | $130.00 |
| 12/4/2014 | COU | Courier Charges: Nov. 2015 | $119.73 |
| 12/30/2014 | SOP | Service of Process, 2nd Amended Complaint: Laughin, Paik, harris, Gezahegne, Gnaba | $300.00 |
| 1/15/2015 | MR | Medical Records: County USC Hospital | $46.09 |
| 1/15/2015 | COU | Courier Charges: File summons and complaint USDC | $45.00 |
| 1/15/2015 | COU | Courier Charges: Dce. 2014 | $82.45 |
| 1/21/2015 | REC | Records: Glendale Police Department | $154.66 |
| 2/23/2015 | PKG | Parking for status conf | $8.00 |
| 3/24/2015 | SRV | Service of Process: Subpeona for Depo of PMK | $50.00 |
| 3/24/2015 | REC | Records: LAPD discovery section | $57.99 |
| 3/31/2015 | MED | Mediation | $1,820.00 |
| 4/10/2015 | REC | Medical Records: LAC+USC | $50.37 |
| 4/20/2015 | PKG | Parking for Mediation | $38.00 |
| 5/21/2015 | COU | Courier Charges for Dec 2014 | $82.32 |
| 7/2/2015 | COP | copies & postage | $216.25 |
| | | **TOTAL** | $3,900.00 |